IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
SAN ANGELO DIVISION

| | | |
|---|---|---|
| MICHAEL ANTHONY OLAGUE, AS | § | |
| DEPENDENT ADMINISTRATOR | § | |
| OF THE ESTATE OF ARTURO | § | |
| MARTINEZ OLAGUE, Deceased | § | |
| *Plaintiff* | § | CIVIL ACTION NO. 6:22-CV-00070-H |
| | § | |
| v. | § | JURY TRIAL DEMANDED |
| | § | |
| CORECIVIC, INC. | § | |
| *Defendant* | § | |

**PLAINTIFF'S SECOND AMENDED ORIGINAL COMPLAINT**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Plaintiff Michael Anthony Olague, duly appointed, qualified and acting as the Dependent Administrator of the Estate of Arturo Martinez Olague, deceased, complaining of Defendant CoreCivic, Inc., and in support thereof would show the Court as follows:

## I.    INTRODUCTION

1.1    Arturo Martinez Olague ("Decedent") was a detainee at the Eden Detention Center, a private prison located in Eden, Texas, because of a non-violent, immigration-related offense. Defendant CoreCivic, Inc. ("CoreCivic") owns and operates Eden Detention Center as a medium-security facility holding male detainees detained by the federal United States Marshals Service agency ("USMS"), pursuant to CoreCivic's contract with USMS.

1.2    CoreCivic is a sprawling giant in the field of private corrections facilities, overseeing more than a hundred facilities nationwide, with over 14,000 employees overseeing 90,000 detainees, and annual revenues approaching 2 billion dollars. See https://en.wikipedia.org/wiki/CoreCivic. In choosing to hold hemophiliac detainees in its

1

Detention Center in Concho County, Texas (much less "high risk" hemophiliacs such as Decedent), CoreCivic knew that in the event of serious injury, it would be unable to promptly transport those hemophiliac detainees to an appropriate healthcare facility, given the absence of such facilities within 150 miles of Concho County.

1.3     Decedent was a hemophiliac – suffering from the rarer, Hemophilia B variety – whom CoreCivic's own medical records describe as being at a "high risk for bleeding".  In January of 2021, Decedent received a series of severe injuries while in the custody of CoreCivic, including two or more unrestrained falls off of his bunk, as well as in a violent altercation with CoreCivic detention officers.  Despite its clearcut duty to protect hemophiliac detainees such as Decedent from the "unreasonable risk of physical harm", CoreCivic failed to take any effective steps to preemptively protect against such fall- and altercation-related injuries, despite Decedent's known history of hemophilia, seizures, injury-causing falls, and difficulty in safely accessing his bunk, including a highly similar injury just four days before Decedent's final fall.  Most glaringly, CoreCivic failed to provide Decedent with the standard recommended treatment for Hemophilia B, which is a regular, prophylactic regime of recombinant Factor IX therapy ("Prophylaxis Therapy"), which serves to greatly reduce the risk of fatalities from those injuries which commonly arise in prison settings.  Likewise, despite its duty to appropriately diagnose and/or treat injured hemophiliac detainees such as Decedent, CoreCivic failed to do so here, as most notably demonstrated in the 8 hour delay between Decedent's final, injurious fall, and his belated arrival at a medical facility able to appropriately care for hemophiliacs.

1.4     Just six days after his final fall, Decedent died of the severe injuries incurred by him while in CoreCivic's custody at the Eden Detention Center.  Plaintiff, as the Dependent

Administrator of Decedent's estate, now brings the present wrongful death and survival claims against CoreCivic.

## II.    JURISDICTION AND VENUE

2.1    Jurisdiction is proper under 28 USC §1332(a)(1) as Plaintiff is a Texas resident, while Defendant CoreCivic is a Maryland corporation, and the amount in controversy exceeds $75,000.

2.2    Venue is proper in this District under 28 USC §1391(b), because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## III.    PARTIES

3.1    On or about December 20, 2022, Plaintiff was issued Letters Of Dependent Administration for the Estate of Arturo Martinez Olague, Deceased, by the Probate Court of Texas, County of Hidalgo.  Plaintiff is therefore the personal representative of Decedent's Estate, and as such is entitled to bring suit for damages owed Decedent pursuant to VTCA Estates Code §351.04(a)(1).

3.2    The statutory beneficiaries of Decedent are entitled to bring an action on account of the wrongful death of Decedent, but they have not commenced any such action within three months of Decedent's death, nor have they requested that Plaintiff not commence this Lawsuit. Therefore, Plaintiff brings this action pursuant to §71.004 of Civil Practice & Remedies Code of Texas, on behalf of the following statutory beneficiaries:

In his individual capacity, Michael Anthony Olague is a United States citizen and a resident of McAllen, Texas.  He is a biological child of Decedent.

Jacqueline Olague is a United States citizen and a resident of McAllen, Texas.  She is a biological child of Decedent.

Stephanie Torres is a United States citizen and a resident of McAllen, Texas. She is a biological child of Decedent.

Arthur Olague is a United States citizen and a resident of McAllen, Texas. He is a biological child of Decedent.

3.3     All four of Decedent's children listed above will be collectively referred to herein as the "Statutory Beneficiaries". See Attached Exhibit A – Letter of Dependent Administration naming Michael Anthony Olague as Dependent Administrator of the Estate of Arturo Martinez Olague.

**Defendant**

3.4     Defendant CoreCivic, Inc., formerly the Corrections Corporation of America, is a for-profit corporation providing correctional and detention services. CoreCivic is a Maryland corporation operating under federal tax laws as a real estate investment trust. CoreCivic does business in this District, including its operation of the Eden Detention Center, located in Eden, Texas. According to the Texas Secretary of State, CoreCivic's registered agent is CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201. Regardless of its place of incorporation, the allegations against CoreCivic primarily arise from its actions and omissions occurring within both the State of Texas and this District.

## IV.    FACTUAL ALLEGATIONS

4.1     CoreCivic owns and operates the Eden Detention Center, a private prison located in Eden, Texas. Pursuant to its contract with the USMS, CoreCivic operates Eden Detention Center as a medium-security facility holding male detainees detained by the federal United States Marshals Service agency. Eden Detention Center is located in Concho County, Texas, population 2,766, which County lacks any healthcare facilities able to provide care to severely injured hemophiliac patients. The nearest regional healthcare facility is the Shannon Medical Center in San Angelo, Texas, a 43 minute drive from the Eden Detention Center. As demonstrated by the

events of this Lawsuit, Shannon Medical Center likewise lacks the ability to provide care to severely injured hemophiliac patients.

4.2     Decedent Arturo Martinez Olague was first arrested on November 7, 2019, and was initially detained in various other detention and/or processing centers located in Texas.  In November of 2020, the United States District Court for the Southern District of Texas sentenced Decedent to 18 months imprisonment for "being found in the U.S. after previous deportation", pursuant to 8 USC §1326.  The sentencing court transferred Decedent to the custody of the USMS and/or Federal Bureau Of Prisons, which initially detained Decedent at various other detention and/or processing centers located in Texas.  On or about December 2, 2020 Decedent was transferred to the Eden Detention Center, pursuant to CoreCivic's existing arrangement with USMS.

4.3     As part of its intake process, CoreCivic received a USM-553 Prisoner In Transit Medical Summary form, which indicated that Decedent suffered from hemophilia, a genetic disorder which prevents blood from clotting normally, and which can significantly heighten the health risks arising from otherwise minor injuries, such as a fall off of a low bunk, or a physical altercation, to a potentially fatal degree.  Such Prisoner In Transit medical records likewise indicated that Decedent was prone to seizures, and Decedent himself would inform CoreCivic that he had last been hospitalized for such seizures in July 2020, and had also broken 3 ribs in a seizure-related fall.  Unsurprisingly, Decedent's Prisoner In Transit records likewise recommended that Decedent be assigned to a bottom bunk only, to reduce the medical risks of injuring himself from falling out of bed.

4.4     At the time of his intake at the Eden Detention Center in December 2020, CoreCivic's personnel (including Tracy Penn, P.A.) performed a health evaluation wherein

5

Decedent's hemophilia and prior history of seizures and falls were acknowledged. In Decedent's computerized medical records, he was expressly listed as suffering from hemophilia, and described as being a "high risk for bleeding". In handwritten remarks on Decedent's intake forms, CoreCivic's personnel (specifically, Diana Alfaro, LVN) explicitly recommended "*low bunk, low tier*". All such CoreCivic employees identified in this Statement Of Facts are collectively referred to herein as "EDC Facility Employees".

4.5    Despite acknowledging that the hemophiliac Decedent was at a "high risk for bleeding", CoreCivic took very little action to preemptively ensure that Decedent received adequate medical care, either before, during or after the infliction of the series-of-injuries giving rise to this Lawsuit. Upon information and belief, CoreCivic did not decline to initially accept Decedent as a detainee at the Eden Detention Center – and/or to transfer him to some other CoreCivic facility better-suited to his known status as a "high risk" hemophiliac – despite Eden Detention Center's lack of proximity to healthcare facilities able to provide either preventative or post-injury care to the hemophiliac Decedent. In fact, the nearest facilities capable of providing such care were located in Austin, more than 160 miles distant from the Eden Detention Center. Such geographic distance is critical for two reasons: first, as shown by the facts of this Lawsuit, when a hemophiliac detainee is severely injured, he requires access to an artificial clotting factor (in the case of Hemophilia B, Factor IX) which – because of its short "shelf life" – only a limited number of large-scale trauma centers keep an adequate supply on hand. In nonetheless choosing to hold the hemophiliac Decedent at its remote Eden Detention Center, CoreCivic has stated it was fully aware of the limited capabilities of nearby healthcare facilities.

4.6    Second, such geographic distance is relevant because the recommended standard of care for hemophiliac detainees strongly emphasizes coordinating their day-to-day preventative

6

care with the closest federally-certified Hemophilia Treatment Center, which was once again located in faraway Austin. See Lambing et al., Factors For Felons – Management Of Incarcerated Hemophiliacs, 21 Haemophilia 772, 777 (2015). CoreCivic, however, wholly failed to coordinate Decedent's preventative care with any Hemophilia Treatment Center.

4.7     Far more significantly, CoreCivic likewise failed to place Decedent on Prophylaxis Therapy, which is a regular regime of recombinant Factor IX therapy (under such brand names as Rebinyn, BeneFIX, Ixinity, etc.), which serves to greatly reduce the risk of fatalities from those injuries which commonly arise in prison settings. This is so despite such Prophylaxis Therapy being recognized as the "optimal" treatment for hemophiliac detainees. Lambing, Factors For Felons, 21 Haemophilia at 776. This was likewise so despite CoreCivic's awareness of its inability to adequately treat any serious injury to a hemophilic detainee "in-house" at the Eden Detention Center. Shortly after Decedent's arrival, for example, CoreCivic personnel acknowledged in writing on December 12, 2020 that needed tooth extractions could not be performed on him at the Center itself, "*due to risk of uncontrolled bleeding*". Moreover, as reflected in such 12/12/20 medical record and numerous others, CoreCivic repeatedly failed to acknowledge that Decedent suffered from the rarer Hemophilia B variety, and hence required "Factor IX" medications, whereas CoreCivic's records repeatedly reference "Factor VIII" medications applicable only to Hemophilia A.

4.8     Prior to any falls occurring in the Eden Detention Center itself, Decedent repeatedly reported to CoreCivic personnel (including EDC Facility Employee Pam Schwertner, R.N.) – in January of 2021 – that he was feeling dizzy, and had a recent history of falls elsewhere. Contemporaneous records kept by CoreCivic personnel (including Pam Schwertner, R.N.) likewise repeatedly record that Decedent was visibly "unsteady" and "off balance".

4.9     On January 23, 2021, Decedent was involved in a physical altercation with CoreCivic Detention Officer Spurgin ("Altercation"), in which Officer Spurgin, an EDC Facility Employee, violently threw Decedent against a metal bunk, and wrestled him into submission, while repeatedly exerting force on Decedent's head ("First Head Injury").  Given that CoreCivic itself was aware that Decedent was a "high risk" hemophiliac, the amount of force and methods of restraint used in the Altercation were inappropriate.  However, CoreCivic has stated that it was corporate policy ***not*** to inform detention officers such as Officer Spurgin of Decedent's hemophilia.  This was so despite the foreseeability of such incidents as the Altercation – between hemophiliac detainees and the detention officers charged with regularly overseeing them – thereby leaving such officers wholly unaware of the need to use alternate methods of restraint.

4.10     In the wake of the Altercation, CoreCivic failed to have Decedent examined by a physician.  Instead, CoreCivic's records indicate only that Decedent was summarily examined by A. Zetuce, R.N., a non-physician who failed to examine Decedent for any possible head injuries, and/or to provide any heightened post-Altercation scrutiny appropriate to Decedent's status as a "high risk" hemophiliac.  This is so despite the fact that, in those medical records discussing Decedent's subsequent head injuries, such Altercation is repeatedly mentioned as an aggravating factor.

4.11     On January 24, 2021, CoreCivic personnel observed Decedent lying on the floor of his cell after a fall, and attempting to climb back into his bunk.  In so doing, Decedent – having already fallen once – then struck his head on the bunk, and suffered a severe head injury which resulted in a concussion ("Second Head Injury").  Decedent was transferred to Shannon Medical Center for emergency care.  CoreCivic's Sandra Morvan, an EDC Facility Employee, later applied to the federal USMS for approval of the costs incurred in treating Decedent's Second Head Injury.

Upon information and belief, in providing healthcare to Decedent, CoreCivic improperly sought to optimize its financial gain under the terms of its contract with USMS, to the detriment of actually providing adequate treatment to Decedent.

4.12    In the wake of the Second Head Injury, CoreCivic failed to take any effective steps to prevent Decedent – a "high risk" hemophiliac with a history of falls and head injuries – from being seriously injured in any similar incident in the future.  Specifically, CoreCivic failed to place Decedent on Prophylaxis Therapy which, had it been timely implemented, would have greatly reduced the severity of any future injury.  CoreCivic likewise failed to transfer Decedent to any alternate detention center located nearer to a healthcare facilities able to treat severely injured hemophiliacs.  Nor did CoreCivic seek to facilitate Decedent's release from custody by reason of his medical condition, despite CoreCivic's policies stressing such release-facilitation as a key job function of its medical personnel.  Finally, despite Decedent's known history of hemophilia, seizures, injury-causing falls, and difficulty in safely accessing his bunk, no physical accommodations to Decedent's bunk or cell (such as rails, padding, or allowing Decedent to sleep on the floor) were undertaken to reduce the risk of Decedent being injured by falling from his bunk a second time.

4.13    Instead, CoreCivic employees implemented an ineffective program to monitor Decedent, as noted by CoreCivic's Elizabeth Cunningham, R.N., an EDC Facility Employee.  Such monitoring program was strictly "reactive" in nature, in that it consisted solely of welfare checks by detention officer twice hourly, and by medical staff once a day.  Accordingly, such a "reactive" monitoring program was necessarily unable to **prevent** injury, as it could only detect when Decedent **had already been injured**.  Moreover, the ineffectiveness of such observation-only monitoring program is further underscored by the fact – in the foreseeable event that the

(already-inflicted) injury was sufficiently severe – neither the Eden Detention Center itself nor any nearby healthcare facilities possessed the resources to timely and adequately treat such an injury. Accordingly, CoreCivic's strictly "reactive" monitoring program was both negligently conceived and/or executed, as amply demonstrated by the fact that Decedent's Final Head Injury occurred under circumstances nearly identical to his Second Head Injury, just 4 days after such monitoring program was instituted in response to Decedent's Second Head Injury.

4.14    In a written Sick Call Request dated January 26, 2021 – two days before his Final Head Injury – Decedent notified CoreCivic that "*I have fallen twice inside this cell.  Both officers have IGNORE me.  I want to see Unit Dr. I need medical help.*"  Despite Decedent's long history of injurious falls, and explicit request to be seen by a physician, CoreCivic merely had a nurse (EDC Facility Employee Nicola Omeally-Andries, R.N.) assess his condition one day later, on January 27, 2021.  Such episode is emblematic of CoreCivic's repeated and negligent failure to ensure that Decedent's care was overseen by actual physicians experienced in treating hemophilia. Instead, CoreCivic repeatedly attempted to financially benefit itself by improperly entrusting Decedent's healthcare to less-costly, less-qualified medical personnel.

4.15    On January 28, 2021, Decedent suffered a third and final head injury when he fell from his bunk onto the concrete floor of his cell, a distance variously reported as being from 18 to 36 inches ("Final Head Injury").  Decedent was initially conscious for a considerable amount of time after receiving his Final Head Injury, during which time Decedent complained of a headache, and attempted to get up from his bunk.  Although CoreCivic personnel (EDC Facility Employees Ronnie Cook and Kenneth Rediger) discovered Decedent's injuries at approximately 12:37 a.m., CoreCivic (including EDC Facility Employee Nurse Practitioner Osa) failed to ensure that Decedent was delivered to an appropriate healthcare facility, in an appropriate manner.  This is so

despite CoreCivic's acknowledged policy of advising EMS responders what healthcare facility a decedent should be taken to, and awareness of the degree of care available to hemophiliac detainees at nearby healthcare facilities.

4.16    Specifically, CoreCivic's records indicate its confusion over whether to transfer Decedent to the clearly inappropriate Concho County Hospital, or the Shannon Medical Center in San Angelo, Texas.  Eventually, Nurse Practitioner Osa directed that Decedent be transferred by ground ambulance to the Shannon Medical Center.  As a result, Decedent did not arrive there until 2:06 am, almost an hour and a half after CoreCivic first became aware of Decedent's Final Head Injury.  However, because Shannon Medical Center lacked the proper facilities to treat injured hemophiliacs (including appropriate lab tests, hematology expertise, and adequate supplies of Factor IX, an artificial coagulant), Shannon Medical Center transferred Decedent – by air ambulance – to an appropriately equipped facility, i.e. St. David's South Austin Medical Center, in Austin, Texas, 200 miles away.  However, St. David's did not assume control of Decedent's care until 8:31 a.m., nearly eight hours after CoreCivic first discovered his Final Head Injury.

4.17    Such an unacceptable 8 hour delay-in-treatment arose from the fact that, despite Decedent's known "high risk" hemophilia and long prior history of fall-related injuries, CoreCivic 1) knowingly and unilaterally chose to detain Decedent, a hemophiliac, in its Eden Detention Center facility, despite the Center's known lack of proximity to healthcare facilities able to supply appropriate care; 2) chose to send Decedent to Shannon Medical Center after his Final Head Injury, despite the fact that CoreCivic knew that such facility was unable to adequately care for injured hemophiliacs; and 3) chose to transport Decedent to Shannon Medical Center via ground ambulance, leading to an almost hour and a half delay between CoreCivic's discovery of Decedent's Final Head Injury, and his arrival at even an inappropriate healthcare facility.

4.18    Despite CoreCivic's knowledge of Decedent's i) "high risk" hemophilia, ii) First, Second and Final Head Injuries and iii) resultant need to be transferred to an appropriate healthcare facility with an ample supply of factor IX, CoreCivic took no steps to assure that Decedent was directly and promptly transported to such an appropriate facility.  Upon information and belief, in initially choosing to transport Decedent by ground ambulance to an inappropriate nearby facility. CoreCivic improperly sought to optimize its financial gain under the terms of its contract with USMS, to the detriment of actually providing adequate treatment to Decedent.  Upon further information and belief, because of the significant financial costs involved in transporting injured detainees (such as Decedent) by air to far-off appropriate healthcare facilities, such care-decisions concerning Decedent's transport were governed by preexisting CoreCivic policies and/or vice principals, rather than those lower-level CoreCivic personnel who were on duty at Eden Detention Center, at the time the Final Head Injury first occurred.

4.19    Decedent died five days later, on February 2, 2021.  The Travis County Medical Examiner listed "blunt head trauma" as the cause of Decedent's death, with Hemophilia B as a contributing condition, and repeatedly noted Decedent's "multiple traumatic head injuries" incurred while in CoreCivic's custody.  Upon information and belief, Decedent's death was proximately caused by CoreCivic's failure to 1) detain Decedent at a CoreCivic location with timely access to adequate healthcare facilities or, in the absence of any such alternate location, refuse to accept Decedent as a detainee; 2) in the alternative, place Decedent on a regime of Prophylaxis Therapy; 3) ensure that Decedent's care was overseen by actual physicians experienced in treating hemophilia, rather than less-costly, less-qualified medical personnel; 4) make necessary modifications to Decedent's bunk and cell, and/or facilitate Decedent's release on

medical grounds; and 5) after the occurrence of Decedent's Final Head Injury, to promptly and directly transfer Decedent to a healthcare facility able to treat severely injured hemophiliacs.

## V.    CAUSES OF ACTION

5.1    In *Minneci v. Pollard*, 565 US 118, 126-130 (2012), the Supreme Court recognized that federal detainees being held in private prisons possessed the right to sue such prisons and their staff under state law, citing *Salazar v. Collins*, 255 SW3d 191, 198-200 (Tex. App. – Waco 2008, no pet.).  The *Minneci* court, *ibid*, further held that such actionable torts included failure to protect detainees from the "unreasonable risk of physical harm", and "negligent failure to diagnose or treat".

### NEGLIGENCE

5.2    Plaintiff incorporates by reference all paragraphs above as if they were fully set forth herein.  As set forth in greater detail below, Plaintiff alleges the following theories of negligence-based liability against CoreCivic:

5.3    CoreCivic is directly liable to Plaintiff by reason of its failure to properly hire, train, monitor and/or supervise its agents or employees who staffed its Eden Detention Center, including the above-identified EDC Facility Employees.  In particular, as illustrated by the Altercation in which Decedent incurred his First Head Injury, CoreCivic intentionally adopted a corporate policy of refusing to inform its detention officers of the special health needs of the detainees they interacted with on a daily basis.

5.4    CoreCivic is directly liable to Plaintiff by reason of its failure to properly adopt, implement, and/or enforce proper policies and procedures regarding both preemptively safeguarding and adequately treating injured hemophiliac detainees, including Decedent.  Most

significantly, CoreCivic failed to place Decedent on Prophylaxis Therapy, despite the known risks of severe injury present in detention facilities.

5.5     CoreCivic is vicariously liable to Plaintiff under the theory of respondeat superior, by reason of the actions or omissions of those agents, servants, and employees of CoreCivic (including the above-identified EDC Facility Employees) who, while acting within the course and scope of their employment for CoreCivic, contributed to Decedent's death.

5.6     Specifically, CoreCivic, as a for-profit private prison, owed its detainees such as Decedent a duty to protect him from the "unreasonable risk of physical harm", and to "diagnose or treat" Decedent in a non-negligent manner.  Plaintiff here alleges that CoreCivic breached its first duty by failing to preemptively protect Decedent, a hemophiliac detainee, from foreseeable injury, by failing to take steps to adequately prevent Plaintiff's First, Second and Final Head Injuries.  Plaintiff further alleges that CoreCivic breached its second duty to properly "diagnose or treat" Decedent's head injuries, once inflicted, including but not limited to promptly and directly transferring Decedent (as a hemophiliac) to an appropriate healthcare facility.

5.7     Each and every one of the foregoing acts and omissions of CoreCivic, taken separately and collectively, constitute a direct and proximate cause of the injuries and damages described herein.

## **WRONGFUL DEATH**

5.8     Plaintiff incorporates by reference all paragraphs above as if they were fully set forth herein.

5.9     CoreCivic owed Decedent, as a detainee within its custody at its Eden Detention Center, a duty of due care to prevent foreseeable harm. Specifically, CoreCivic had actual knowledge of (or reasonably should have known of) the risk of harm, injury or death to detainees

like Decedent posed by falling from a bunk, given Decedent's known history of hemophilia, seizures, injury-causing falls, difficulty in safely accessing his bunk, as well as his First Head Injury received in the recent Altercation.  Likewise, CoreCivic was aware that Decedent had suffered a Second Head Injury – in a similar bunk-related incident just four days before his Final Head Injury – but failed to take preventative measures sufficient to prevent such a reoccurrence. Specifically, CoreCivic not only failed to make alterations to Decedent's bunk and cell, but failed to place Decedent on Prophylaxis Therapy, failed to transfer Decedent to an alternate CoreCivic detention center, and failed to even attempt to facilitate Decedent's release, by reason of his medical condition.

5.10    Additionally, as the owner and operator of the Eden Detention Center where Decedent was detained, CoreCivic had actual knowledge of (or reasonably should have known of) the risk of harm, injury or death to detainees like Decedent, resulting from CoreCivic's failure to properly address Decedent's injuries inflicted during such First through Final Head Injuries – including its failure to promptly and directly transfer him to an appropriate healthcare facility (i.e. one possessing an adequate supply of the artificial coagulant, Factor IX).  This is because CoreCivic had prior knowledge of Decedent's specialized treatment needs as a hemophiliac, and his extensive prior history of accidents.  Nonetheless, despite such knowledge, CoreCivic failed to protect Decedent from such unreasonable risk of physical harm, by sending him to an inappropriate healthcare facility.

5.11    CoreCivic was reckless when it failed to properly hire, train, monitor and/or supervise its agents or employees (including the above-identified EDC Facility Employees) who staffed its Eden Detention Center at the time of Decedent's detention there, regarding the policies and procedures necessary to 1) protect detainees such as Decedent from the unreasonable risk of

physical harm posed by detainee/guard altercations and/or falling from his bunk (given Decedent's known history of hemophilia, seizures, injury-causing falls, difficulty in safely accessing his bunk, and recent Altercation); and 2) ensure the prompt and adequate treatment of injured hemophiliac detainees, including their timely transfer to appropriate medical care facilities.

5.12    CoreCivic was likewise reckless when it failed to properly adopt, implement, and/or enforce the policies and procedures necessary to 1) protect detainees such as Decedent from the unreasonable risk of physical harm posed by detainee/guard altercations and/or falling from his bunk (given Decedent's known history of hemophilia, seizures, injury-causing falls, difficulty in safely accessing his bunk, and recent Altercation); 2) ensure that Decedent was placed on Prophylaxis Therapy; and 3) ensure the prompt and adequate treatment of injured hemophiliac detainees, including their timely transfer to appropriate medical care facilities.

5.13    Each and every one of the foregoing acts and omissions of CoreCivic, taken separately and collectively, constitute a direct and proximate cause of the injuries and damages described herein, including Decedent's death.

5.14    At the time of his death, Decedent was 53 years of age.  He was in good health, with a reasonable life expectancy of at least 25 additional years.  In all probability, Decedent would have continued caring for and supporting his four children, i.e. the Statutory Beneficiaries, until his death.

5.15    The Statutory Beneficiaries have suffered pecuniary loss from the death of their father, Decedent, including losses of care, maintenance, support, services, advice, counsel and contributions of a pecuniary value that the Statutory Beneficiaries would, in reasonable probability, have received from Decedent during his lifetime had he lived.  The Statutory Beneficiaries have also lost the inheritance that Decedent, in all reasonable probability, would have

left to them by will or inheritance. The Statutory Beneficiaries have suffered additional losses by virtue of the destruction of the parent-child relationship, including the right to love, affection, solace, comfort, companionship, society, emotional support and happiness. The various Statutory Beneficiaries have suffered severe mental depression and anguish, grief and sorrow as a result of the death of their father, Decedent, and are likely to continue to suffer for a long time in the future. For all these losses, Plaintiff seeks wrongful death damages exceeding $75,000.

<u>**SURVIVAL ACTION**</u>

5.16    Plaintiff re-alleges and incorporates herein by reference, as though set forth in their entirety, the allegations contained in the preceding paragraphs.

5.17    Each and every one of the foregoing acts and omissions of CoreCivic, taken separately and collectively, constitute a direct and proximate cause of the injuries and damages described herein. As a direct and proximate result of the aforementioned negligent actions of CoreCivic in connection with Decedent's First through Final Head Injuries, and CoreCivic's subsequent failure to properly diagnose and treat his injuries, Decedent died. Specifically, in the 10 days between his First Head Injury and his eventual death, Decedent endured significant pain and suffering, as a result of both the injuries originally resulting from the negligence of CoreCivic (and/or its agents, servants, and employees, including the above-identified EDC Facility Employees), and their subsequent inadequate treatment of those injuries. In particular, CoreCivic's own records show that Decedent was "ambulatory and conscious" in the wake of the Final Head Injury.

5.18    As a result of the First through Final Head Injuries made the basis of this Lawsuit, Decedent's Estate incurred the following damages:

    i)        The conscious pain and suffering incurred by Decedent as a result of the First through Final Head Injuries; and

    ii)       Funeral and burial expenses.

By reason of all of the above, Decedent's Estate has been damaged in an amount in excess of the minimum jurisdictional limits of this Court.

### **RESPONDEAT SUPERIOR**

5.19    Plaintiff incorporates by reference all paragraphs above as if they were fully set forth herein.

5.20    Both prior to Decedent's First through Final Head Injuries, and immediately thereafter, those individuals staffing or overseeing the Eden Detention Center (including the above-identified EDC Facility Employees) who i) failed to protect detainee Decedent from the unreasonable risk of physical harm posed by detainee/guard altercations and/or falling from his bunk (given Decedent's known history of hemophilia, seizures, injury-causing falls, difficulty in safely accessing his bunk, and recent Altercation), and/or who ii) thereafter failed to timely and properly diagnose and treat Decedent's injuries inflicted during such First through Final Head Injuries, and/or who iii) failed to properly adopt, implement, and/or enforce proper policies and procedures regarding both preemptively safeguarding and adequately treating Decedent, as an injured hemophiliac detainee, were the agents, servants, and employees of CoreCivic, and were acting within the course and scope of their employment for CoreCivic in so doing.

5.21    At the time of Decedent's First through Final Head Injuries and immediately thereafter, all such individuals staffing or overseeing the Eden Detention Center were engaged in the furtherance of the business affairs and/or common business enterprise of their employer CoreCivic, and were likewise engaged in accomplishing work tasks for CoreCivic's benefit.

5.22    Accordingly, under such theory of vicarious liability, Plaintiff invokes the doctrine of *respondeat superior* against CoreCivic.

**<u>GROSS NEGLIGENCE</u>**

5.23    Plaintiff incorporates by reference all paragraphs above as if they were fully set forth herein.

5.24    The actions of CoreCivic (through its vice principals and/or its agents, servants, and employees, including the above-identified EDC Facility Employees) described herein occurred as a result of the type of conscious indifference and reckless disregard toward the safety of others as to allow for the award of exemplary or punitive damages under Texas law.  Such conduct, as described more fully herein constitutes gross negligence.  As a result, Plaintiff hereby seeks exemplary damages pursuant to VTCA Civ. Prac. & Rem. Code §41.003, in an amount that may be found by the jury.

5.25    The acts and omissions of Defendant CoreCivic (through its vice principals and/or its agents, servants, and employees, including the above-identified EDC Facility Employees) described herein – when viewed from the standpoint of such Defendant at the time of the act or omission – involved an extreme degree of risk, considering the probability and magnitude of the potential harm to Decedent, a "high risk" hemophiliac whom CoreCivic (and/or its agents, servants, and employees) knowingly accepted and kept at its remote Eden Detention Center, despite CoreCivic's preexisting knowledge of the inadequate care available from nearby healthcare facilities, in the foreseeable event of a severe injury.  Similarly, CoreCivic failed to place Decedent on Prophylaxis Therapy, despite the known risk of severe injury present in detention facilities, and the recognized efficacy of such Prophylaxis Therapy in greatly reducing the risks of such injuries. This is especially so given that, as an involuntary detainee in Eden Detention Center, Decedent

19

was entirely dependent on CoreCivic (and/or its agents, servants, and employees, including the above-identified EDC Facility Employees) in 1) seeking to safeguard himself from the risk of falling off of his bunk, and 2) obtaining adequate medical care for his First through Final Head Injuries which occurred while in CoreCivic's custody.

5.26    Accordingly, Defendant CoreCivic (through its vice principals and/or its agents, servants, and employees including the above-identified EDC Facility Employees) exhibited a conscious indifference to the rights, safety, or welfare of Decedent by failing to both properly adopt, implement, and/or enforce proper policies and procedures, as well as to properly hire, train, monitor and/or supervise its agents or employees who staffed its Eden Detention Center, regarding 1) protecting detainees such as Decedent from the unreasonable risk of physical harm posed by detainee/guard altercations and/or falling from his bunk (given Decedent's known history of hemophilia, seizures, injury-causing falls, difficulty in safely accessing his bunk, and recent Altercation), 2) placing Decedent on Prophylaxis Therapy, and 3) ensuring the prompt diagnosis and treatment of injured hemophiliac detainees, including their timely and direct transfer to appropriate medical care facilities.  Accordingly, CoreCivic (through its vice principals and/or its agents, servants, and employees, including the above-identified EDC Facility Employees) knew or should have known that their dangerous and reckless manner of 1) adopting, implementing, and/or enforcing proper hemophilia-related policies and procedures, and/or 2) hiring, training, monitoring and/or supervising its agents or employees who staffed or oversaw hemophiliacs (such as Decedent) at its Eden Detention Center would cause injuries and death.

5.27    Each and every one of the foregoing acts and omissions of CoreCivic, taken separately and collectively, constitute a direct and proximate cause of the injuries and damages described herein, including Decedent's suffering and eventual death.

20

5.28    CoreCivic (through its vice principals and/or its agents, servants, and employees, including the above-identified EDC Facility Employees) had actual, subjective awareness of the risks involved in the above-described acts or omissions, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of hemophiliac detainees such as Decedent.  On the facts stated herein, Plaintiff hereby requests that exemplary damages be awarded against CoreCivic.

## VI.    DAMAGES

6.1    Plaintiff incorporates by reference all paragraphs set forth above, as if fully set forth here.

6.2    Each and every one of the foregoing acts and omissions of CoreCivic, taken separately and collectively, constitute a direct and proximate cause of the following injuries and damages suffered by Decedent and/or the Statutory Beneficiaries.

6.3    As a result of the act and omissions of CoreCivic (through its vice principals and/or its agents, servants, and employees, including the above-identified EDC Facility Employees), Decedent suffered harms including but not limited to humiliation, pain, physical injuries, loss of liberty, severe fear, anxiety, and the loss of his life, the value of which is to be determined according to proof.

6.4    As a result of the acts and omissions of CoreCivic (through its vice principals and/or its agents, servants, and employees, including the above-identified EDC Facility Employees), the Statutory Beneficiaries suffered the loss of their parent-child relationship with Decedent, including loss of care, comfort, solace, protection, services, and/or parental love; loss of companionship and society sustained in the past and future; loss of inheritance, mental anguish in the past and future, as well as the support of Decedent and loss of inheritance, the value of which is to be determined according to proof.

6.5     As a result of the acts and omissions of CoreCivic (through its vice principals and/or its agents, servants, and employees), the Statutory Beneficiaries suffered and incurred expenses for the funeral and burial of the Decedent, the value of which is to be determined according to proof.

## VII.    JURY DEMAND

7.1     Plaintiff hereby demands a trial by jury.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Michael Anthony Olague, Dependent Administrator of the Estate of Arturo Martinez Olague, Deceased, requests that Defendant CoreCivic, Inc. be cited to appear and answer, and that on final trial the Plaintiff be awarded judgment:

a) For compensatory damages according to proof;

b) For punitive damages according to proof;

c) For an award of interest, including prejudgment interest at the legal rate according to proof;

d) For costs of suit incurred here on all causes of action; and

e) For such other and further relief as the court may deem proper.

Respectfully submitted,

GUERRA LAW FIRM
320 W. Pecan Avenue
McAllen, Texas 78501
Tel. (956) 618-2557
Fax. (956) 618-1690

By:     **/s/ MANUEL GUERRA, III**
MANUEL GUERRA, III
Texas Bar No. 00798226
SD Tx ID No.:  22998
Attorney for Plaintiff

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 2, 2023, I electronically transmitted the attached Plaintiff's Second Amended Petition to the Clerk's Office using the CM/ECF System to the following counsel of record:

Daniel P. Struck
Kristina R. Rood
STRUCK LOVE BOJANOWSKI & ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
Via ECF eService: struck@strucklove.com
krood@strucklove.com

And

Larry W. Bale, TX Bar No. 01629830
HAY, WITTENBURG, DAVIS, CALDWELL
& BALE, L.L.P.
One East Twohig, Third Floor
P. O. Box 271
San Angelo, Texas 76902-0271
Via ECF eService: lwb@hwdcb.com

***Attorneys for Defendant CoreCivic, Inc.***

*/s/ Manuel Guerra, III*
*MANUEL GUERRA, III*