UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
SAN ANGELO DIVISION

MICHAEL OLAGUE, as dependent
administrator of the estate of Arturo
Martinez Olague,

      Plaintiff,

v.                                                                    No. 6:22-CV-070-H

CORECIVIC, INC.,

      Defendant.

## MEMORANDUM OPINION AND ORDER

This is a civil suit brought by a deceased detainee's estate and statutory beneficiaries against CoreCivic, Inc., the owner of Eden Detention Center (EDC). The plaintiff, Michael Anthony Olague, as the dependent administrator of the estate of Arturo Martinez Olague, brings claims for wrongful death and survival. He asserts that the defendant was grossly negligent and is vicariously liable under the doctrine of respondeat superior.

Before the Court are the defendant's motion to dismiss the plaintiff's first amended complaint for failure to state a claim upon which relief can be granted (Dkt. No. 27) and the plaintiff's opposed motion for leave to file his second amended complaint (Dkt. No. 38). Because the plaintiff has sufficiently pled only certain allegations of negligence, the Court grants in part and denies in part the defendant's motion to dismiss. Further, because the plaintiff has not shown good cause to allow a second, untimely amendment to his complaint, the Court denies the plaintiff's motion for leave to file his second amended complaint.

## 1.      Factual and Procedural Background

### A.      Plaintiff's Factual Allegations in his First Amended Complaint[1]

The plaintiff, Michael Anthony Olague, is the dependent administrator of the estate of his father, Arturo Martinez Olague (the decedent), who passed away while he was a detainee at EDC.  Dkt. No. 14 ¶¶ 1.1, 1.4, 3.1–3.2.  The plaintiff brings claims on behalf of the estate, himself, and his three siblings, the other statutory beneficiaries.  *Id.* ¶¶ 3.1–3.2.

The defendant, CoreCivic, Inc., pursuant to a contract with the Federal Bureau of Prisons, owns and operates EDC,[2] a medium-security facility housing males detained by the federal government for immigration-related offenses.  *Id.* ¶ 4.1.  EDC is located in Eden, Texas.  *Id.*  The medical facility closest to EDC is Shannon Medical Center in San Angelo, Texas, which is approximately a 43-minute drive from EDC.  *Id.*

The decedent was transferred to EDC on December 2, 2020, to serve a sentence for an immigration-related offense.  *Id.* ¶ 4.2.  Upon the decedent's arrival at EDC, the facility received the decedent's recent medical records, which indicated that he suffered from hemophilia—a "genetic disorder which prevents blood from clotting normally."  *Id.* ¶ 4.3.  Additionally, the medical records provided to EDC stated that the decedent was prone to seizures.  *Id.*  Such seizures required hospitalization in July 2020 and, on another occasion, resulted in a fall that broke three of the decedent's ribs.  *Id.*

---

[1] These allegations are taken from the plaintiff's first amended complaint, which the Court accepts as true when resolving a motion to dismiss.  *Villarreal v. Wells Fargo Bank, N.A.*, 814 F.3d 763, 766 (5th Cir. 2016).

[2] The plaintiff's first amended complaint refers to "CoreCivic employees" as "EDC Facility Employees," *id.* ¶ 4.4, and the Court likewise uses the terms interchangeably when referring to CoreCivic employees who worked at EDC.

Notably, the medical records included a recommendation that the decedent sleep in a bottom bunk to reduce the risk of injury were he to fall from the bed. *Id.* Staff members at EDC, including Tracy Penn, P.A., evaluated the decedent's health upon his arrival, and one medical professional at EDC—Diana Alfaro, LVN—similarly recommended that the decedent be assigned to a "*low bunk, low tier.*" *Id.* ¶ 4.4 (emphasis in original).

In January 2021, the decedent reported to at least one medical professional at EDC—Pam Schwertner, R.N.—that he was "feeling dizzy[] and had a recent history of falls." *Id.* ¶ 4.5. Moreover, the medical records kept by EDC employees around that time noted that the decedent was "unsteady" and "off balance." *Id.*

On January 23, the decedent was invovled in a "physical altercation" with an EDC detention officer, Spurgin. *Id.* ¶ 4.6. The plaintiff alleges that, given the decedent's "known status as a hemophiliac," Officer Spurgin used an "inappropriate" amount of force and method of restraint when he "violently threw [the d]ecedent against a metal bunk[] and wrestled him into submission, while repeatedly exerting force on [the d]ecedent's head." *Id.* While the plaintiff does not identify any specific injury resulting from this altercation, he refers to the force Officer Spurgin exerted on the decedent's head as the decedent's "First Head Injury." *Id.*

The following day, EDC personnel observed the decedent "lying on the floor after a fall." *Id.* ¶ 4.7. When the decedent attempted to climb back into his bunk, he struck his head on the metal bunk, resulting in a concussion. *Id.* He was transferred to Shannon Medical Center for emergency care and later transferred back to EDC. *Id.* Following this injury, EDC employees "implemented a program to monitor [the d]ecedent." *Id.* ¶ 4.8. EDC employees did not "preemptively transfer [the d]ecedent to an alternate facility located

nearer to an appropriate healthcare facility, in the event that such another, similar injury should occur," nor did they take other "proactive steps[] such as rails, padding, or allowing [the d]ecedent to sleep on the floor" to reduce the risk of another fall. *Id.*

On January 26, the decedent wrote a Sick Call Request that stated, "*I have fallen twice inside this cell. Both officers have IGNORE[D] me. I want to see Unit Dr. I need medical help.*" *Id.* ¶ 4.9 (emphasis in original). A nurse at EDC—Nicola Omeally-Andries, R.N.—assessed the decedent on January 27. *Id.* The plaintiff asserts that, "[u]pon information and belief, such care-decision was made by a corporate vice-principal of CoreCivic." *Id.*

Then, on January 28, the decedent fell from his bunk at EDC. *Id.* ¶ 4.10. The decedent remained conscious after this fall "for a considerable amount of time . . . during which time [the d]ecedent complained of a headache, and attempted to get up from his bunk." *Id.* Two EDC employees—Ronnie Cook and Kenneth Rediger—discovered the decedent's injuries at approximately 12:37 a.m., but CoreCivic employees, including a nurse practitioner, Osa, "failed to ensure that [the d]ecedent was delivered to an appropriate healthcare facility[] in an appropriate manner." *Id.* Specifically, certain CoreCivic employees working at EDC, including Osa, transferred the decedent via ground ambulance to Shannon Medical Center in San Angelo, Texas. *Id.* ¶ 4.11.

The decedent arrived at Shannon Medical Center at 2:06 a.m. *Id.* However, Shannon Medical Center did not have the "proper facilities to treat injured hemophiliacs (including appropriate lab tests, hematology expertise, and adequate supplies of factor IX, an artificial coagulant)." *Id.* Accordingly, Shannon Medical Center transferred the decedent via air ambulance to St. David's South Austin Medical Center in Austin, Texas,

200 miles away.  *Id.*  St. David's "assume[d] control of [the d]ecedent's care [at] 8:31 a.m."
*Id.*

The decedent passed away on February 2.  *Id.* ¶ 4.14.  The medical examiner listed the "sole cause of [the d]ecedent's death" as "blunt head trauma."  *Id.*  The plaintiff contends that the decedent's death was proximately caused by the defendant's failure to "preemptively protect" the hemophiliac decedent from injury and failure to properly treat the decedent after injury. *Id.*

The plaintiff claims the care the decedent received was inappropriate because the defendant, despite its knowledge of the decedent's hemophilia and "long prior history of fall-related injuries," (1) chose to detain the decedent at EDC, which "lack[s] proximity to medical facilities able to supply appropriate care," *id.* ¶ 4.12; (2) failed to "preemptively protect hemophiliac detainees such as [the decedent] from injury, including head injuries," *id.* ¶ 4.14; (3) chose to send the decedent to Shannon Medical Center after his injury on January 28, despite the fact that the defendant "knew or should have known that such facility was unable to adequately care for injured hemophiliacs," *id.* ¶ 4.12; and (4) chose to transport the decedent to Shannon Medical Center via ground ambulance, which allegedly resulted in an approximately hour-and-a-half delay in receiving medical treatment, *id.*  The plaintiff further claims that, upon information and belief, the decisions regarding transporting and treating hemophiliac detainees were "shared with upper-level CoreCivic vice principals, rather than those lower-level CoreCivic personnel who were on duty at [EDC]," due to "the significant financial costs" involved.  *See id.* ¶ 4.13.

Based on these alleged actions of the defendant's employees, the plaintiff's first amended complaint asserts wrongful death and survival claims, arguing that the defendant:

(1) "fail[ed] to properly hire, train, monitor and/or supervise its agents or employees" at

EDC; and (2) "fail[ed] to properly adopt, implement, and/or enforce proper policies and

procedures regarding both preemptively safeguarding and adequately treating injured

hemophiliac detainees." *Id.* ¶¶ 5.3–5.4; *see also id.* ¶¶ 5.7–5.17.  The plaintiff also alleges that

the defendant is vicariously liable under the doctrine of respondeat superior for the allegedly

negligent conduct of its employees who failed to preemptively protect the decedent from

foreseeable head injuries and failed to properly diagnose and treat such injuries.  *Id.*

¶¶ 5.5–5.6, 5.18–5.21.  Based on this alleged conduct, the plaintiff also asserts that the

defendant was grossly negligent and is liable for punitive damages.  *See id.* ¶¶ 5.22–5.26.

### B.    Procedural History

On December 3, 2021, the plaintiff and the decedent's other biological children filed

suit, alleging wrongful death and gross negligence claims against the defendant (the original

suit).  *See* Pls.' Original Compl. at 2–8, *Olague v. CoreCivic, Inc.*, No. 6:21-CV-071 (N.D. Tex.

Dec. 3, 2021), Dkt. No. 1.  The Court dismissed the original suit without prejudice because

the decedent's children lacked standing to bring claims under the Texas Survival Statute.

*See* Order at 2, *Olague*, No. 6:21-CV-071 (N.D. Tex. Sept. 6, 2022), Dkt. No. 20 (Cummings,

J.).  The Order noted that, should the plaintiffs obtain standing, "they should also re-plead

the factual assertions in their complaint to meet their pleading burden."  *Id.* at 2 n.1.

Following the dismissal of the original suit, one of the decedent's children, Michael

Anthony Olague, was appointed the dependent administrator of the decedent's estate.  Dkt.

Nos. 1-1; 14 ¶¶ 3.1–3.2.  On December 21, 2022, Michael Anthony Olague filed the instant

suit on behalf of the decedent's estate and statutory beneficiaries.  Dkt. No. 1.  On February

14, 2023, the defendant filed a motion to dismiss all of the plaintiff's claims pursuant to

Federal Rule of Civil Procedure 12(b)(6). Dkt. No. 10. On March 6, the plaintiff filed a response to the defendant's motion to dismiss (Dkt. No. 15) and his first amended complaint (Dkt. No. 14). The defendant moved to dismiss the first amended complaint on March 27. Dkt. No. 27. Consequently, the Court denied the defendant's first motion to dismiss as moot. Dkt. No. 34.

On April 5, 2023, the Court issued a scheduling order. Dkt. No. 29. With respect to amendments, the scheduling order specified that each party was entitled to file one amended pleading as a matter of course by June 2, 2023. *Id.* at 3. To file an additional amended pleading or an amended pleading after June 2, 2023, the scheduling order required the party to obtain written consent from the opposing party or leave of court. *Id.* Additionally, the scheduling order stated that after June 2, 2023, the Court would only grant leave to file an amended pleading upon a showing of good cause. *Id.*

On June 2, 2023, the plaintiff attempted to file a second amended complaint without the defendant's written consent or leave of court.[3] *See* Dkt. No. 37. Defendant's counsel emailed plaintiff's counsel that day and requested that he withdraw the second amended complaint. Dkt. No. 38-3 at 4. Instead of withdrawing, plaintiff's counsel then attempted to confer with defendant's counsel regarding whether the defendant opposed the filing of the second amended complaint. *See id.* at 1. Defendant's counsel responded on June 12, and informed plaintiff's counsel that the defendant was opposed to the filing. *See id.* On June 13, the plaintiff filed his opposed motion for leave to file the second amended complaint. Dkt. No. 38.

---

[3] The Clerk of Court later withdrew the plaintiff's second amended complaint. *See* Dkt. No. 37.

### C.    Plaintiff's New Allegations in the Proposed Second Amended Complaint

In his proposed second amended complaint, the plaintiff makes new allegations regarding the defendant's alleged failure to provide proper medical care.  The plaintiff does not assert new or additional claims, but instead weaves these new allegations into the claims asserted in his first amended complaint.  *See generally* Dkt. No. 38-2 ¶¶ 5.2–5.28. Specifically, the plaintiff first alleges that, during the decedent's detention at EDC, the defendant failed to follow the recommended standard of care for hemophiliac detainees— namely, the defendant did not "coordinat[e the decedent's] day-to-day preventative care with the closest federally-certified Hemophilia Treatment Center."  *Id.* ¶ 4.6.

Second, the plaintiff alleges that the defendant "failed to place [the d]ecedent on Prophylaxis Therapy, which is a regular regime of recombinant Factor IX therapy . . . which serves to greatly reduce the risk of fatalities from those injuries which commonly arise in prison settings."  *Id.* ¶ 4.7.  The plaintiff further avers that the defendant "fail[ed] to acknowledge that [the d]ecedent suffered from the rarer Hemophilia B variety, and hence required 'Factor IX' medications, whereas [the defendant's] records repeatedly reference 'Factor VIII' medications applicable only to Hemophilia A."  *Id.*

Third, the plaintiff alleges that the defendant "has stated that it was corporate policy ***not*** to inform detention officers such as Officer Spurgin of [the d]ecedent's hemophilia . . . despite the foreseeability of such incidents as the [a]ltercation" between the decedent and Officer Spurgin, "thereby leaving such officers wholly unaware of the need to use alternate methods of restraint."  *Id.* ¶ 4.9 (emphasis in original).  The plaintiff also claims that following the altercation between the decedent and Officer Spurgin, the defendant failed to have a physician examine the decedent and, instead, had a registered nurse examine him.

– 8 –

*Id.* ¶ 4.10.  The plaintiff states the nurse "failed to examine [the d]ecedent for any possible head injuries, and/or to provide any heightened post-[a]ltercation scrutiny appropriate to [the d]ecedent's status as a 'high risk' hemophiliac."  *Id.*  Importantly, the plaintiff claims that "in those medical records discussing [the d]ecedent's subsequent head injuries, such [a]ltercation is repeatedly mentioned as an aggravating factor."  *Id.*

In addition, the plaintiff alleges that, following the decedent's second head injury, the defendant failed to "transfer [the d]ecedent to an alternate CoreCivic detention center" closer to an appropriate medical facility.  *Id.* ¶ 5.9; *see also* ¶ 4.12.  The plaintiff further alleges that the defendant failed to comply with its own policies because it did not "seek to facilitate [the d]ecedent's release from custody by reason of his medical condition, despite [the defendant's] policies stressing such release-facilitation as a key job function of its medical personnel."  *Id.* ¶ 4.12.  The plaintiff also adds that the medical examiner who examined the decedent after his death noted Hemophilia B as a contributing condition to his death and that the decedent had incurred "multiple traumatic head injuries" while in the defendant's custody.  *Id.* ¶ 4.19.

### D.  Pending Motions

Before the Court are the defendant's motion to dismiss the first amended complaint for failure to state a claim upon which relief can be granted (Dkt. No. 27) and the plaintiff's opposed motion for leave to file his second amended complaint (Dkt. No. 38).  The plaintiff responded to the motion to dismiss (Dkt. No. 31), and the defendant replied (Dkt. No. 33).  Likewise, the defendant responded to the plaintiff's motion for leave to file the second amended complaint (Dkt. No. 39), and the time for the plaintiff to reply has expired, *see* Loc. Civ. R. 7.1(f).  Accordingly, the motions are ripe for review.

2.     **Defendant's Motion to Dismiss Plaintiff's First Amended Complaint**

   A.     **Standard of Review**

A plaintiff's complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  Therefore, to survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*

In resolving a motion to dismiss, the Court must "accept all well-pleaded facts as true and view those facts in the light most favorable to the plaintiff."  *Richardson v. Axion Logistics, L.L.C.*, 780 F.3d 304, 306 (5th Cir. 2015) (cleaned up) (quoting *Bustos v. Martini Club, Inc.*, 599 F.3d 458, 461 (5th Cir. 2010)).  However, courts "do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions."  *Gentilello v. Rege*, 627 F.3d 540, 544 (5th Cir. 2010) (quoting *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.

   B.     **Analysis**

In general, in the first amended complaint, the plaintiff alleges that the defendant breached its duty to protect the decedent from an unreasonable risk of physical harm by failing to take steps to prevent, diagnose, and treat the head injuries the decedent incurred while detained at EDC.  Dkt. No. 14 ¶ 5.6.  The plaintiff avers he has not asserted a negligence claim separate from his wrongful death and survival claims but, rather, provides

"an overview of the '*theories of negligence-based liability*' underlying [his] formal causes of action for wrongful death, survivorship, respondeat superior, gross negligence, and punitive damages, all of which rely upon an underlying finding of negligence." Dkt. No. 31 at 14 (emphasis in original).

Generally, to establish negligence in Texas, a party must show that: (1) the defendant owed the plaintiff a duty; (2) the defendant breached that duty; and (3) the plaintiff suffered damages proximately caused by the breach. *Croy v. United States*, --- F. Supp. 3d ----, No. DR-22-CV-00005-AM/VRG, 2023 WL 6393888, at *8 (W.D. Tex. Oct. 2, 2023) (citing *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004)). With respect to the duty of care owed by a privately managed federal facility, the United States Supreme Court has noted "specific authority indicating that state law imposes general tort duties of reasonable care (including medical care) on prison employees in every one of the eight States[—including Texas—]where privately managed secure federal facilities are currently located." *Minneci v. Pollard*, 565 U.S. 118, 128–29 (2012) (citing *Salazar v. Collins*, 255 S.W.3d 191, 198–200 (Tex. App.—Waco 2008, no pet.); *see also Croy*, 2023 WL 6393888, at *8 ("A detention center owes a duty of reasonable care to a detainee.").

The plaintiff claims that the defendant's negligent acts included: (1) failing to take preventative measures to prevent reoccurring head injuries resulting from the decedent falling from his bunk, Dkt. No. 14 ¶ 5.8; (2) "fail[ing] to promptly and directly transfer [the decedent] to an appropriate medical care facility (i.e.[,] one possessing an adequate supply of the artificial coagulant, factor IX)," *id.* ¶ 5.9; (3) "fail[ing] to properly hire, train, monitor and/or supervise its agents and employees . . . regarding the policies and procedures necessary to" (i) protect hemophiliac detainees from "the unreasonable risk of physical

– 11 –

harm posed by detainee/guard altercations and/or falling from [a] bunk," and (ii) "ensure the prompt and adequate treatment of injured hemophiliac detainees," *id.* ¶ 5.10; and (4) "fail[ing] to properly adopt, implement, and/or enforce" the same "necessary" policies and procedures, *id.* ¶ 5.11. The plaintiff claims that the decedent died as a proximate result of the defendant's "actions and inactions." *Id.* ¶¶ 5.12, 5.16.

The Court finds that the plaintiff has failed to adequately plead a wrongful death claim based on Officer Spurgin's allegedly negligent conduct during his altercation with the decedent and dismisses any wrongful death theory related to those allegations—including those allegations that the defendant negligently hired, trained, supervised, or monitored Officer Spurgin. However, the survival claim based on the alleged negligence of Officer Spurgin and the wrongful death and survival claims based on the alleged conduct of the defendant and its employees regarding the preventative care and medical treatment provided to the decedent while at EDC survive. Consequently, the plaintiff's related contentions that the defendant is liable for the actions of these employees under the doctrine of respondeat superior, was grossly negligent, and is liable for punitive damages likewise survive.

### i.    Wrongful Death and Survival Claims

The plaintiff has sufficiently alleged wrongful death and survival claims, except for the wrongful death claim based on Officer Spurgin's actions. Under Texas law, "[a] person is liable for damages arising from an injury that causes an individual's death if the injury was caused by the person's or his agent's or servant's wrongful act, neglect, carelessness, unskillfulness, or default." Tex. Civ. Prac. & Rem. Code § 71.002(b) (West 2023). The term "person" includes corporations, like CoreCivic. *Id.* § 71.001(2). To plead a claim for wrongful death, the plaintiff must allege: "(1) 'wrongful or negligent conduct of the

defendant' and (2) 'proximate cause resulting in death.'"  *Croy*, 2023 WL 6393888, at *9

(quoting *Schippers v. Mazak Props., Inc.*, 350 S.W.3d 294, 298 (Tex. App.—San Antonio

2011, pet. denied)).

A survival action is "[a] personal injury action [that] survives to and in favor of the

heirs, legal representatives, and estate of the injured person."  Tex. Civ. Prac. & Rem. Code

§ 71.021(b) (West 2023).  "'To file a survival action, the claimant must plead the elements of

the decedent's cause of action and' their authority to prosecute the suit."  *Croy*, 2023 WL

6393888, at *8 (quoting *Davis v. Bills*, 444 S.W.3d 752, 757 (Tex. App.—El Paso 2014, no

pet.)).

With respect to the wrongful death and survival claims, the defendant does not argue

that it did not owe the decedent a duty of care.  *See generally* Dkt. No. 27 at 11–17.  Rather,

the defendant claims that the plaintiff's first amended complaint should be dismissed

because: (1) the plaintiff's allegations are contradictory and, therefore, "negate any inference

that CoreCivic (or its employees) engaged in any wrongful or negligent conduct," *id.* at

12–14; (2) the plaintiff's allegations as to negligent hiring, training, monitoring, and

supervision are too conclusory to state a claim, *id.* at 14–15; and (3) the plaintiff fails to

establish the requisite connection between the defendant's employees' actions and the

decedent's death, *id.* at 15–16.

### a.    "Contradictory" Allegations

The defendant first seeks dismissal on the basis that the plaintiff makes

"contradictory allegations" that "negate any inference" that the defendant "engaged in any

wrongful or negligent conduct."  *Id.* at 12.  More specifically, the defendant claims that

because it took some preventative measures—including recommending and assigning the

decedent a low bunk and monitoring the decedent following one of his falls—the defendant could not have been negligent in any way. *Id.* at 12–13. Likewise, the defendant points out that, as alleged, it transported the decedent to the closest medical facility, the decedent arrived at the facility approximately 1.5 hours after his third head injury was discovered, and the defendant did not have control of the care at that medical facility. *Id.* at 13. Thus, the defendant argues that the plaintiff cannot claim its decisions regarding the transfer were negligent. *Id.* at 13–14.

The Court rejects the defendant's argument. Foremost, the plaintiff's allegations are not contradictory. The plaintiff acknowledges that the defendant took measures such as assigning the decedent to a low bunk and monitoring the decedent after his second head injury. Dkt. No. 14 ¶¶ 4.4, 4.8. The plaintiff also agrees that the decedent arrived at Shannon Medical Center approximately 1.5 hours after his third head injury. *Id.* ¶ 4.11. But the fact that the defendant took these steps to prevent injury to the decedent and provide medical care does not necessarily mean that the defendant did not breach the duty of care it owed to the decedent. In short, the plaintiff does not make "contradictory allegations" but, rather, argues that the defendant's duty required it to take additional preventative measures, such as railings on the bunk, and to undertake a different course of treatment, such as a faster mode of transportation to a different facility. *See id.* ¶¶ 4.8, 4.12–4.13. The defendant presents no authority to support its argument that the plaintiff's acknowledgment that the defendant provided some care to the decedent completely negates any inference of negligence. Accordingly, the Court declines to dismiss any of the plaintiff's claims on this basis.

**b.**      **Negligent Hiring, Training, Monitoring, and Supervision**

The defendant next argues that the plaintiff failed to state claims under a theory of negligent hiring, training, monitoring, and supervision, contending that he "fails to plead any non-conclusory factual allegations that CoreCivic was negligent in hiring, training, supervising, and monitoring any CoreCivic employee." Dkt. No. 27 at 14–15. Viewing the allegations through the requisite lens, the Court disagrees.

"Negligent hiring, training, supervision, and retention claims are 'simple negligence causes of action based on an employer's direct negligence rather than on vicarious liability.'" *Hernandez v. Ventura Sys LLC*, No. 3:23-CV-2244-D, 2024 WL 583500, at *3 (N.D. Tex. Feb. 13, 2024) (quoting *Phillips v. Super Servs. Holdings, LLC*, 189 F. Supp. 3d 640, 648 (S.D. Tex. 2016)). The Texas Supreme Court has not definitively ruled on the "existence, elements, and scope" of claims for negligent hiring, training, supervision, and retention. *See Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 804 n.27 (Tex. 2010); *see also Endeavor Energy Res., L.P. v. Cuevas*, 593 S.W.3d 307, 311 (Tex. 2019). The Texas Supreme Court has, however, recognized that such claims "require[] negligence by two separate parties: the employer's negligence in hiring[, training, supervising, or monitoring] the employee and the employee's subsequent negligent act or omission." *Cuevas*, 593 S.W.3d at 311. Likewise, federal district courts in Texas agree that, in all of these claims, in addition to proving the employer was negligent, "the plaintiff also must prove that the employee committed an actionable tort." *Rhine v. First Baptist Dall. Church*, No. 3:14-CV-3055-M-BH, 2016 WL 6471941, at *5 (N.D. Tex. Oct. 4, 2016), *report and recommendation adopted*, 2016 WL 6436335 (N.D. Tex. Oct. 31, 2016).

The only specific argument the defendant offers for its contention that the plaintiff's allegations as to the defendant's negligent hiring, training, supervision, and monitoring of its employees are conclusory is related to the altercation between the plaintiff and Officer Spurgin. *See* Dkt. No. 27 at 14–15. Specifically, the defendant claims that the "[p]laintiff fails to provide any factual underpinnings showing how CoreCivic was negligent in hiring, training, supervising, or monitoring him." *Id.* at 15. However, the plaintiff pleads that Officer Spurgin used an inappropriate "amount of force and methods of restraint." Dkt. No. 14 ¶ 4.6. And he argues that:

> CoreCivic was reckless when it failed to properly hire, train, monitor and/or supervise its agents and employees (including the above-identified EDC Facility Employees) . . . regarding the policies and procedures necessary to . . . protect detainees such as [the d]ecedent from the unreasonable risk of physical harm posed by detainee/guard altercations . . . given [the d]ecedent's known history of hemophilia.

*Id.* ¶ 5.10. Therefore, the plaintiff alleges negligent conduct on the part of Officer Spurgin, specifically the inappropriate amount and manner of force exerted during the altercation with decedent. He also alleges negligent conduct on the part of CoreCivic, specifically that it should have educated Officer Spurgin on how to interact with hemophiliac detainees and managed his conduct to prevent such inappropriate exertions of force on hemophiliac detainees. Thus, the allegations as to the defendant's negligent hiring, training, monitoring, and supervision of Officer Spurgin are not conclusory.

The remaining negligent hiring, training, monitoring, and supervision theories are against CoreCivic regarding the EDC employees who made decisions as to the measures put in place to prevent the decedent from falling from his bunk and the decedent's medical care and transport to a medical facility following his head injuries. *See id.* ¶ 5.10. The plaintiff attributes these decisions to CoreCivic employees in his factual allegations. *See, e.g.*, *id.* ¶ 4.8

("[U]nknown CoreCivic employees supposedly implemented a program to monitor [the

d]ecedent, as noted by CoreCivic's Elizabeth Cunningham, R.N., an EDC Facility

Employee.  However, despite [the d]ecedent's known history of hemophilia . . . no proactive

steps . . . were taken."); *id.* ¶ 4.11 ("CoreCivic (including Nurse Practitioner Osa) first

directed that [the d]ecedent be transferred i) by ground ambulance ii) to the Shannon

Medical Center in San Angelo, Texas.").  Additionally, the plaintiff alleges independent

tortious conduct on the part of CoreCivic by claiming the employees' allegedly negligent

conduct in failing to prevent or treat the decedent's injuries resulted from CoreCivic's:

> fail[ure] to properly hire, train, monitor and/or supervise its agents or
> employees (including the above-identified EDC Facility
> Employees) . . . regarding the policies and procedures necessary to . . . protect
> detainees such as [the d]ecedent from the unreasonable risk of physical harm
> posed by . . . falling from [a] bunk[,] given [the d]ecedent's known history of
> hemophilia, seizures, injury-casing falls, difficulty in safely accessing his bunk,
> and recent [a]ltercation[]; and (2) ensure the prompt and adequate treatment of
> injured hemophiliac detainees, including their timely transfer to appropriate
> medical care facilities.

*Id.* ¶ 5.10.

Viewing the allegations in the light most favorable to plaintiff, the first amended

complaint alleges specific instances of negligent hiring, training, monitoring, and

supervision by CoreCivic and tortious conduct by individual employees.  Thus, the plaintiff

sufficiently alleged that (1) CoreCivic owed a legal duty to protect the decedent from an

unreasonable risk of harm, *id.* ¶¶ 5.6, 5.8; (2) CoreCivic breached that duty by failing to

properly hire, train, monitor, or supervise its employees in specific ways, *id.* ¶ 5.10; and

(3) the decedent's pain and suffering, funeral expenses, and death were proximately caused

by CoreCivic's breach, *id.* ¶¶ 5.12, 5.17.  Additionally, the plaintiff sufficiently alleged

negligent conduct on the part of certain EDC Facility Employees that proximately caused

the decedent's head injuries that allegedly resulted in his death.  *See id.* ¶¶ 4.6, 4.8,

4.10–4.11.

In sum, the Court declines to dismiss the plaintiff's wrongful death and survival

actions on this basis, as the plaintiff's allegations as to the defendant's allegedly negligent

hiring, training, monitoring, and supervision of its employees are not conclusory.

### c.   Causation

Finally, the defendant argues that the plaintiff's wrongful death and survival claims

fail because he "fails to plausibly connect the dots between any action by a CoreCivic

employee and [the d]ecedent's ultimate injury—i.e., his death."  Dkt. No. 27 at 15.  The

Court agrees as to the wrongful death action based on the conduct of Officer Spurgin, but it

disagrees otherwise.

Under Texas law, "[u]nder both the wrongful death and survival statutes, the

claimant must prove a death and the occurrence of a wrongful act."  *Davis*, 444 S.W.3d at

757.  In a wrongful death action, "[i]f the alleged wrongful act is negligence, the claimant

must establish that the defendant's negligent act or omission was a substantial factor in

bringing about the decedent's death, and without it, the death of the decedent would not

have occurred."  *See id.*  Whether a defendant's negligence was a substantial factor in

bringing about the decedent's death "cannot be satisfied by mere conjecture, guess, or

speculation."  *IHS Cedars*, 143 S.W.3d at 798–99.

With respect to causation, "a plaintiff seeking to recover under Texas's wrongful

death statute must demonstrate that the defendant's wrongful actions more likely than not

caused the decedent's death—not just that they reduced the decedent's chance of survival by

some lesser degree."  *Slade v. City of Marshall*, 814 F.3d 263, 264–65 (5th Cir. 2016) (citing

*Kramer v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 404 (Tex. 1993)).  "The [Texas wrongful death] statute 'authorizes claims only for actions that actually *cause* death.'"  *Peterson v. Silverado Senior Living, Inc.*, 790 F. App'x 614, 617 (5th Cir. 2019) (emphasis in original) (quoting *Kramer*, 858 S.W.2d at 404).  "At the motion to dismiss stage, a plaintiff need only plead facts that make it plausible that a defendant's wrongful actions more likely than not caused the decedent's death."  *Blackmon v. Tex. Dep't of Crim. Just. Allan B. Polunsky Unit*, No. 9:22-CV-182-MJT-CLS, 2023 WL 5833411, at *14 (E.D. Tex. July 7, 2023) (cleaned up), *report and recommendation adopted*, 2023 WL 5430326 (E.D. Tex. Aug. 22, 2023).

In applying the Texas negligence standard, the Fifth Circuit has declined to find a "plausible inference" of causation in determining whether medical treatment caused a wrongful death when the court would have to make several suppositions to achieve causation.  *See Peterson*, 790 F. App'x at 617.  In *Peterson*, the plaintiff claimed a nursing facility administered the decedent a medication that might cause a patient to contract pneumonia, which caused the decedent to contract pneumonia and die.  *Id.*  The Fifth Circuit upheld the dismissal of the wrongful death claim, finding causation was not sufficiently pled when the connection between the defendant's actions and the decedent's death was "tenuous at best."  *Id.*  Because there were other potential causes for the decedent's pneumonia and for her death, the Fifth Circuit stated the complaint could not support a plausible inference that it was more likely than not that the defendant's conduct was the cause of the death.  *Id.*  Conversely, a plaintiff's claim of causation is sufficient in a Texas wrongful death suit if "a breach of the standard of care [is] not too remote for a reasonable jury to find it to be the proximate cause of [the decedent's] death."  *See Windrum v. Kareh*, 581 S.W.3d 761, 781 (Tex. 2019).

– 19 –

The defendant argues that the plaintiff cannot state wrongful death and survival claims based on any negligent act or negligent hiring, training, monitoring, or supervision of Officer Spurgin.  Dkt. No. 27 at 15–16.  It argues the plaintiff fails to show that it is plausible to infer that any injury sustained as a result of the altercation between the decedent and Officer Spurgin caused the decedent's death.  *Id.*

The plaintiff alleges that Officer Spurgin "violently threw [the d]ecedent against a metal bunk, and wrestled him into submission, while repeatedly exerting force on [the d]ecedent's head ('First Head Injury')."  Dkt. No. 14 ¶ 4.6.  However, the defendant asserts that the two head injuries allegedly sustained after the altercation with Officer Spurgin are "intervening" events that "likely caused his death"—one of which was, according to the defendant, the fault of the decedent.  Dkt. Nos. 27 at 15–16; 33 at 7 n.4.  The plaintiff argues a superseding, intervening cause must be an act by a third party, and here, all acts of negligence are attributable to the defendant.  Dkt. No. 31 at 17.

Texas law defines a new and independent cause as:

> one that intervenes between the original wrong and the final injury such that the injury is attributed to the new cause rather than the first and more remote cause.  An intervening cause thus supersedes the defendant's negligence by destroying the causal connection between that negligence and the plaintiff's injury thereby relieving that defendant of liability.

*Dew v. Crown Derrick Erectors, Inc.*, 208 S.W.3d 448, 450 (Tex. 2006) (citations omitted). However, "a new and independent cause that extinguishes the liability of a party cannot arise out of an affirmative act of negligence by either the plaintiff or the defendant."  *Biaggi v. Patrizio Rest. Inc.*, 149 S.W.3d 300, 305 (Tex. App.—Dallas 2004, pet. denied).  Because, taking the facts alleged by the plaintiff as true, all injuries suffered by the decedent were a result of negligent acts by the defendant, none of the later injuries are superseding causes

– 20 –

that cuts off the defendant's potential liability for any head injury caused by Officer Spurgin's actions. *See id.* Thus, the Court declines to dismiss the plaintiff's wrongful death and survival claims based on the defendant's superseding-cause argument.

The Court finds, however, that the plaintiff's amended complaint is not sufficient to support a plausible inference that Officer Spurgin's actions more likely than not caused the decedent's death. *See Peterson*, 790 F. App'x at 617. The plaintiff alleges only that Officer Spurgin "repeatedly exert[ed] force on [the d]ecedent's head." Dkt. No. 14 ¶ 4.6. The plaintiff generally refers to this incident as causing the decedent's "First Head Injury," without any allegations as to the nature or severity of the injury or any effects thereof. *See id.* According to the plaintiff, the day after this altercation, the decedent incurred a head injury from striking his head on his bunk while attempting to climb into it, which resulted in a concussion. *Id.* ¶ 4.7. And a few days after that, the decedent suffered another head injury when he fell from his bunk to the floor. *Id.* ¶ 4.10. Both of these subsequent head injuries resulted in the decedent being transferred from EDC to Shannon Medical Center for medical care. *See id.* ¶¶ 4.7, 4.10–4.11. The plaintiff then attributes the decedent's death, at least in part, to the "unacceptable 8 hour delay-in-treatment" that allegedly occurred when transferring the decedent from EDC to Shannon Medical Center and then to the facility in Austin after the third head injury. *Id.* ¶¶ 4.11–4.12, 4.14.

Although these subsequent events do not qualify as superseding causes, they do make the connection between Officer's Spurgin's alleged exertion of force on the decedent's head and the decedent's death "tenuous at best." *See Peterson*, 790 F. App'x at 617. That is, to find causation under the Texas wrongful death statute, a factfinder would have to find that—even with the two subsequent head injuries, an 8-hour delay in proper treatment, and

the medical examiner's finding that the decedent's death was caused by blunt head trauma, *see* Dkt. No. 14 ¶ 4.14—it was more likely than not that if Officer Spurgin had not exerted force on the decedent's head, he would not have died.  Like *Peterson*, "[t]here are simply too many suppositions required here to achieve causation under the preponderance of the evidence standard."  *See* 790 F. App'x at 617.  Thus, the Court finds that the complaint does not plausibly allege that the allegedly negligent acts committed by Officer Spurgin more likely than not caused the decedent's death.  Accordingly, the plaintiff has failed to state a claim for wrongful death based on any negligent acts of Officer Spurgin during his altercation with the decedent.

However, "[w]hether the injury caused the death is immaterial in a survival action because wrongful death and survival actions are distinct causes of action."  *Cunningham v. Haroona*, 382 S.W.3d 492, 508 (Tex. App.—Fort Worth 2012, pet. denied).  Thus, the defendant's argument that a survival action fails because the plaintiff failed to connect the allegedly negligent actions of Officer Spurgin to the decedent's death is unavailing.  The plaintiff's survival action based on any injury suffered by the decedent prior to death as a result of Officer Spurgin's allegedly negligent actions survives dismissal.

Accordingly, the Court dismisses the wrongful death claim insofar as it is related to the altercation between Officer Spurgin and the decedent.  The Court declines to dismiss any survival claim related to this altercation or any wrongful death and survival claims related to the decisions regarding preventative measures and treatment made by CoreCivic employees.

      ii.     **Respondeat Superior Liability**

The defendant next claims that the plaintiff cannot hold CoreCivic vicariously liable for the actions of its employees under a theory of respondeat superior because the plaintiff "fails to adequately state a negligence claim against any CoreCivic employee." Dkt. No. 27 at 18.

"Respondeat superior imposes liability on the employer that is responsible for the acts of his employee, acting in the scope of his employment, where the negligence of the employee is shown to have been the proximate cause of injury." *DeWitt v. Harris County*, 904 S.W.2d 650, 654 (Tex. 1995). Under Texas tort law, "[t]he doctrine of respondeat superior is not an independent tort. It is instead recognition that 'liability for one person's fault may be imputed to another who is himself entirely without fault solely because of the relationship between them.'" *Walgreens v. McKenzie*, 676 S.W.3d 170, 180–81 (Tex. App.— Houston [14th Dist.] 2023, pet. filed) (quoting *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 540 (Tex. 2002)). This theory of liability "is connected to the underlying tort and survives or fails alongside it." *Id.* at 181.

Because the Court dismisses the wrongful death claim insofar as it relates to the conduct of Officer Spurgin, any attempt to hold CoreCivic responsible for Officer Spurgin's conduct in allegedly bringing about the decedent's death fails as well. CoreCivic may, however, be liable for the conduct of Officer Spurgin under respondeat superior with respect to the plaintiff's survival claim.

Likewise, because the plaintiff has sufficiently pled claims for wrongful death and survival against the employees of CoreCivic responsible for the decisions regarding the preventative steps and medical care provided to the decedent (or lack thereof), the Court

finds that the plaintiff has sufficiently alleged that CoreCivic is responsible for these allegedly tortious actions under the theory of respondeat superior.  *See supra* Section 2.B.i; Dkt. No. 14 ¶¶ 5.29-5.20.

### iii. Gross Negligence

Finally, the defendant seeks dismissal of the plaintiff's claim of gross negligence and request for punitive damages, arguing that they fail because the plaintiff's negligence theories fail.  Dkt. No. 27 at 18–21.

As an initial matter, "gross negligence is contingent upon an affirmative finding of ordinary negligence."  *Pecan Valley Mental Health Mental Retardation Region Operating as Pecan Valley Ctrs. for Behav. & Developmental Healthcare v. Doe*, 678 S.W.3d 577, 594 (Tex. App.— Eastland 2023, pet. filed).  As to the allegations the Court finds sufficient to plead wrongful death and survival claims, *see supra* Section 2.B.i.c, it also finds the plaintiff has sufficiently pled gross negligence.

Gross negligence means an act or omission:

(A) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

(B) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

Tex. Civ. Prac. & Rem. Code Ann. § 41.001(11) (West 2023).  "A corporation is liable for the gross negligence of its agents where the corporation authorizes or ratifies an agent's gross negligence or if it is grossly negligent in hiring an unfit agent."  *McElvy v. Sw. Corr., LLC*, No. 3:19-CV-1264-N, 2021 WL 4476762, at *9 (N.D. Tex. Sept. 29, 2021) (citing *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex. 1998)).  A corporation may also be

liable for gross negligence if it "commits gross negligence through a vice principal, such as a corporate officer or other employee with managerial duties." *Id.* (citing *Ellender*, 968 S.W.2d at 922).

As previously discussed, the plaintiff has sufficiently pled a survival claim based on Officer Spurgin's alleged actions and wrongful death and survival claims based on the alleged actions of CoreCivic employees with respect to preventative measures and medical treatment decisions. Additionally, the plaintiff contends that the defendant, through its vice principals and employees, engaged in conduct that involved an extreme degree of risk considering the decedent's status as a hemophiliac involuntarily detained at EDC. Dkt. No. 14 ¶ 5.24. The plaintiff further alleges that the defendant, through its vice principals and employees, was consciously indifferent to the decedent's rights, safety, and welfare. *Id.* ¶¶ 5.25–5.26. The plaintiff alleges the defendant failed to adopt and enforce policies and procedures regarding proper preventative and medical care and failed to properly hire, train, monitor, and supervise its employees regarding the same, despite having actual, subjective awareness of the increased risks involved. *Id.* Finally, the plaintiff alleges the defendant's acts resulted in the decedent's "suffering and eventual death." *Id.* ¶ 5.25. Thus, viewing the allegations in a light most favorable to the plaintiff, the plaintiff's allegations of gross negligence survive dismissal.

The defendant points out that CoreCivic employees took some steps to prevent the decedent falling from his bunk, provided medical care and transferred him to a hospital after his injuries, implemented a monitoring program, and "proactively provide[d] care to [the d]ecedent." Dkt. No. 27 at 19. It argues that these facts negate the plaintiff's claim for gross negligence because they undermine a finding of conscious indifference. *Id.* Although the

parties do not dispute that the defendant took some steps to prevent injury and provided some medical treatment upon injury, "[e]vidence of 'some care' will not disprove gross negligence as a matter of law." *Turner v. Franklin*, 325 S.W.3d 771, 784 (Tex. App.—Dallas 2010, pet. denied) (citing *Ellender*, 968 S.W.2d at 923–24).

Accordingly, the defendant has not shown that the plaintiff has failed to state facts that, if true, could support a finding of gross negligence based on the preventative and medical care provided to the decedent. The Court declines to dismiss the allegations of gross negligence based on these alleged facts. Consequently, the defendant's claim that the plaintiff's request for punitive damages should be dismissed for failure to properly plead gross negligence, *see* Dkt. No. 27 at 20–21, likewise fails.

\*      \*      \*

In sum, the Court grants in part and denies in part the defendant's motion to dismiss the plaintiff's first amended complaint. The Court dismisses any wrongful death claim based on the allegedly negligent conduct of Officer Spurgin. Any survival action based on Officer Spurgin's conduct and the wrongful death and survival actions based on the preventative care and medical treatment provided by CoreCivic employees survive dismissal.

**3.**     **Plaintiff's Motion for Leave to File his Second Amended Complaint**

    **A.**     **Standard of Review**

        **i.**     **Leave to Amend Under Federal Rules of Civil Procedure 15 and 16**

With regard to the plaintiff's motion for leave to amend the complaint for a second time (Dkt. No. 38), the parties first dispute whether the Court should evaluate the motion under the good cause standard in Federal Rule of Civil Procedure 16(b)(4) or the more liberal standard in Rule 15(a)(2). *Compare* Dkt. No. 38 at 3–4, *with* Dkt. No. 39 at 10.

Federal Rule of Civil Procedure 15(a)(1) allows a party to amend a pleading "once as a matter of course" within 21 days of serving the pleading or receiving the opposing party's responsive pleading or motion. Fed. R. Civ. P. 15(a)(1). "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). When evaluating whether to allow leave to amend under Rule 15, "[t]he court should freely give leave when justice so requires." *Id.* In contrast, after a court has entered a deadline to amend pleadings in its scheduling order, the "schedule may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4).

The Fifth Circuit has held that "Rule 16(b) governs amendment of pleadings after a scheduling order deadline has expired. Only upon the movant's demonstration of good cause to modify the scheduling order will the more liberal standard of Rule 15(a) apply to the district court's decision to grant or deny leave." *S&W Enters., L.L.C. v. SouthTrust Bank of Ala., NA*, 315 F.3d 533, 536 (5th Cir. 2003).

The plaintiff exercised his right to file one amended complaint as a matter of course. *See* Dkt. No. 14. Therefore, to file a second amended complaint, he was required under Rule 15 to obtain the opposing party's written consent or leave of court. *See* Fed. R. Civ. P. 15(a)(1)–(2). The Court then entered a scheduling order with a deadline of June 2, 2023, to

amend the pleadings.  Dkt. No. 29 at 3.  However, the plaintiff attempted to file his second amended complaint on the last possible day allowed by the scheduling order without obtaining the defendant's consent or leave of court.  *See* Dkt. No. 37.  The plaintiff did not seek leave of court to file his second amended complaint until June 13, 2023, a week and a half after the deadline to amend.  Dkt. No. 38.  Accordingly, because the Fifth Circuit has made clear that "Rule 16(b) governs amendment of pleadings after a scheduling order deadline has expired," *S&W Enters., L.L.C.*, 315 F.3d at 536, the Court applies Rule 16(b) to determine whether the plaintiff has shown good cause to modify the scheduling order and allow him to amend his pleading after the deadline.

### ii.      Good Cause under Federal Rule of Civil Procedure 16(b)

A district court has "broad discretion to preserve the integrity and purpose of the pretrial order."  *Sw. Bell Tel. Co. v. City of El Paso*, 346 F.3d 541, 547 (5th Cir. 2003) (quoting *S&W Enters., L.L.C.*, 315 F.3d at 535).  "The good cause standard [of Rule 16(b)] requires the 'party seeking relief to show that the deadlines cannot reasonably be met despite the diligence of the party needing the extension.'"  *Id.* at 546 (quoting *S&W Enters., L.L.C.*, 315 F.3d at 535).

In determining whether good cause exists to modify a scheduling order under Rule 16(b)(4), a court "consider[s] four factors: '(1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice.'"  *Id.* (quoting *S&W Enters., L.L.C.*, 315 F.3d at 536).  A court "assesses [the factors] holistically" and "remembers at all times that the good cause inquiry focuses on the diligence of the party seeking to modify the scheduling order."  *EEOC v. Serv. Temps, Inc.*, No. 3:08-CV-1552-D,

2009 WL 3294863, at *3 (N.D. Tex. Oct. 13, 2009).  Therefore, "[a] party's mere inadvertence to meet a deadline imposed by a scheduling order, and the absence of prejudice to the opposing side, are insufficient to establish good cause."  *Garcia v. Univ. of Tex. Sw. Med. Ctr. at Dall.*, No. 3:11-CV-3282-B, 2012 WL 4457499, at *1 (N.D. Tex. Sept. 26, 2012).  Similarly, even if a court finds an amendment is important because it adds a possible basis for recovery, the court can deny leave to amend if the party seeking amendment "offer[s] no explanation" for its failure to comply with the scheduling order. *See Fahim v. Marriott Hotel Servs., Inc.*, 551 F.3d 344, 348 (5th Cir. 2008).

### B.    Analysis

In applying the four-factor test, the Court finds that the plaintiff has not met the good cause standard of Rule 16(b) and denies leave to amend.

### i.    Plaintiff's Explanation for Failure to Timely Seek Leave

The first factor weighs against the plaintiff because he provided no explanation why he failed to timely move for leave to amend.  *See generally* Dkt. No. 38.  In his motion, the plaintiff states that his proposed second amended complaint "does little more than advance the interests of all parties, by conforming [the p]laintiff's pleadings to the matters recently disclosed by CoreCivic's March, 2023 Second Motion To Dismiss and May, 2023 Discovery Responses."  *Id.* at 3.  But the plaintiff did not provide any reason why, after he was served with the motion to dismiss on March 27, 2023, *see* Dkt. No. 27 at 22, and the discovery responses on May 17, 2023, *see* Dkt. No. 36 at 1, he could not meet the June 2, 2023 deadline to seek leave to amend his complaint a second time.

In his motion, the plaintiff argued for leave to amend under the Rule 15(a) standard and failed to specifically address the factors considered when deciding whether to modify a

scheduling order under Rule 16(b)(4).  *See* Dkt. No. 38 at 3–5.  The defendant, however, pointed out in its response that the plaintiff "ma[de] no effort to articulate any diligence he exhibited in attempting to comply with the Court's Scheduling Order."  Dkt. No. 39 at 10–11.  Although the plaintiff exercised some diligence in attempting to meet the deadline by filing the second amended complaint on the last possible day, he did not file a reply or otherwise exercise his opportunity to provide a reason for his delay in requesting leave to amend.  The standard requires a party seeking leave to amend after the deadline has passed to show the deadlines could not be met despite the party's diligence, but the plaintiff provided no explanation for his failure to seek leave to amend within the months and weeks between his receipt of the motion and discovery responses and the June 2 deadline.  Thus, this factor weighs against modifying the scheduling order and allowing a late amendment. *Cf. Fahim*, 551 F.3d at 348.

### ii.   Importance of Proposed Amendments

Courts in the Northern District have found amendments to be important under the Rule 16(b) standard if they potentially provide additional grounds for a party to recover or "directly affect a party's prospects of ultimate recovery."  *Mallory v. Lease Supervisors, LLC*, No. 3:17-CV-3063-D, 2019 WL 3253364, at *3 (N.D. Tex. July 19, 2019) (cleaned up) (quotations omitted); *see also Gutierrez v. Dall. Indep. Sch. Dist.*, No. 3:09-CV-1036-K, 2010 WL 11618879, at *2 (N.D. Tex. Oct. 15, 2010) (finding an amendment important "because it would add another ground for relief to [the plaintiff's] claims").  The importance of the proposed amendments weighs in favor of granting the plaintiff's request to amend his complaint because at least some—but not all—of the proposed amendments could increase the plaintiff's chance of recovery.

First, the plaintiff contends that the amended complaint is necessary to address a statement made by the defendant in its motion to dismiss.  He argues that the defendant "made the admission that it was corporate policy ***not*** to inform its detention officers of [the d]ecedent's hemophilia, such that the officer who inflicted [the d]ecedent's First Head Injury during their [a]ltercation [Officer Spurgin] lacked any advance knowledge that alternate methods of restraint might be required."  Dkt. No. 38 at 3 (emphasis in original).  However, as discussed above, *see supra* Section 2.B.i.b, the plaintiff sufficiently alleged that the defendant failed to properly hire, train, monitor, or supervise its employees, including Officer Spurgin, "regarding the policies and procedures necessary to . . . protect detainees such as [the d]ecedent from the unreasonable risk of physical harm posed by detainee/guard altercations . . . given [the d]ecedent's known history of hemophilia."  Dkt. No. 14 ¶ 5.10. This allegation is sufficient to encompass the plaintiff's proposed amendment about the defendant's policy as to dissemination of a detainee's medical information to its detention officers.  Thus, this amendment is not necessary to the survival of the plaintiff's claims and, therefore, is unimportant.

Next, the plaintiff claims that the second amended complaint is necessary to further address the delay between the decedent's injury and his arrival at the medical facility in Austin.  *See* Dkt. No. 38 at 4.  More specifically, the plaintiff states that the defendant admitted in its written discovery responses that it "affirmatively advised" EMS personnel to transport the decedent to a certain facility and knew the level of care available at that allegedly unsuitable facility.  *See id.*  However, the plaintiff already alleges in the first amended complaint that the defendant "directed" that the decedent be transferred to Shannon Medical Center and "knew or should have known that such facility was unable to

– 31 –

adequately care for injured hemophiliacs." *Id.* ¶¶ 4.11–4.12.  Thus, this amendment is not important because it does not add new information that could ultimately affect the plaintiff's chance of recovery.

Finally, and most importantly, the plaintiff includes new allegations regarding the decedent's hemophilia and its connection to his death.  First, the plaintiff adds the allegation that the defendant failed to coordinate the decedent's day-to-day preventative care with a certified hemophilia treatment facility and failed to provide the decedent with the recommended prophylaxis therapy, which is "a regular regime of recombinant Factor IX therapy" given to patients with the Hemophilia B variety.  Dkt. No. 38-2 ¶¶ 4.6–4.7.  Next, the proposed amended complaint states, for the first time, that the defendant failed to have the decedent examined by a physician for possible head injuries after the altercation with Officer Spurgin, despite the defendant's knowledge of the decedent's "high-risk" hemophilia.  *Id.* ¶ 4.10.  The plaintiff further asserts that the medical records discussing the decedent's second and third head injuries mention the altercation between the decedent and Officer Spurgin as "an aggravating factor."  *Id.*  The proposed amended complaint also changes its allegation regarding the medical examiner's noted cause of death from the "sole" cause as "blunt head trauma," Dkt. No. 14 ¶ 4.14, to "'blunt head trauma' as the cause of [the d]ecedent's death, with Hemophilia B as a contributing condition," Dkt. No. 38-2 ¶ 4.19.

Although the defendant contests the accuracy of these proposed amendments, if true, these allegations could increase the plaintiff's chance of ultimate recovery.  In his first amended complaint, the plaintiff makes lengthy factual allegations as to the decedent's status as a hemophiliac, the defendant's knowledge of such status, and the defendant's

failure to properly treat the decedent with respect to the increased risks caused by hemophilia. *See generally* Dkt. No. 14. But he does not state that the decedent's hemophilia was a "contributing condition" to his death until his proposed second amended complaint. *See* Dkt. No. 38-2 ¶ 4.19. The plaintiff also adds new allegations as to measures the defendant should have taken to prevent the decedent's injuries and the defendant's knowledge of the decedent's medical diagnosis. *See id.* ¶¶ 4.6–4.7. Finally, the plaintiff's allegations regarding the defendant's failure to properly treat the decedent after the altercation with Officer Spurgin and that the altercation was an "aggravating factor" in his subsequent head injuries that led to his death, for the first time, tie the three events together. *See id.* ¶ 4.10.

As foreseeability and causation are well-known components of a negligence claim, if these alleged facts are true, it could increase the plaintiff's ability to show that the defendant was negligent in not taking measures to prevent foreseeable injury to a hemophiliac detainee and that such inaction caused the decedent's death. More specifically, the "aggravating factor" allegation could cure the fatal defect discussed above regarding the causation element of any wrongful death claim based on the altercation with Officer Spurgin. *See supra* Section 2.B.i.c. Accordingly, at least some of the proposed amendments are important in that they could increase the plaintiff's chance of recovery, and this factor weighs in favor of granting leave to amend.

### iii.   Potential Prejudice and Opportunity to Cure

With respect to prejudice, the plaintiff argues that there is no prejudice to the defendant because, at the time of his motion, no depositions had been conducted and the trial date is several months away. Dkt. No. 38 at 3; *see also* Dkt. No. 29 at 2. The defendant

disagrees, arguing that allowing the amendments would cause undue prejudice because it has already expended time and resources in filing its motions to dismiss and responding to discovery, and it likely would have to expend additional time and resources in filing an additional motion to dismiss if the Court allows the plaintiff to file his second amended complaint.  Dkt. No. 39 at 17.

The Fifth Circuit has upheld the denial of leave to amend when a dispositive motion based on the live pleadings was pending, citing the district court's reasoning that amendment of a complaint at this juncture may "potentially . . . undermine the [opposing party's] right to prevail on a motion that necessarily was prepared without reference to an unanticipated amended complaint." *Overseas Inns S.A. P.A. v. United States*, 911 F.2d 1146, 1151 (5th Cir. 1990).  However, courts generally find prejudice would arise in this context when an amendment's "attempt to broaden the issues would likely require additional discovery and another motion for summary judgment," *Parish v. Frazier*, 195 F.3d 761, 764 (5th Cir. 1999), rather than at the stage where the defendant has a pending motion to dismiss.

If, as it claims, the defendant is likely to expend time and money to file an additional motion to dismiss should the amendment be allowed, there is potential prejudice to the defendant in allowing the untimely amendment.  To be sure, the potential prejudice is not to the degree typically found when a summary judgment motion is pending.  *See Parish*, 195 F.3d at 763–64 (upholding a denial of leave to amend sought on the same day a summary judgment motion was filed); *Overseas Inns S.A. P.A.*, 911 F.2d at 1151 (upholding a denial of leave to amend when a summary judgment motion had been filed and the case had been pending for over two years).  Additionally, the parties have continued to conduct discovery

– 34 –

during the time these motions have remained pending. *See generally* Dkt. Nos. 40, 42, 44–51, 53, 59, 61–69. And the new allegations do not add new claims but, rather, add additional facts to support the plaintiff's current theories of recovery. Thus, the time and cost to the defendant if it were to bring an additional motion to dismiss upon allowance of an amended claim is likely not extraordinary.

Even so, the plaintiff initially filed suit based on the same factual underpinnings over two years ago in December 2021. *See* Pls.' Original Compl. at 3–8, *Olague*, No. 6:21-CV-071 (N.D. Tex. Dec. 3, 2021), Dkt. No. 1. And allowing the proposed amendments that include new factual allegations could further delay the litigation and "require additional discovery and another motion." *Parish*, 195 F.3d at 764.

Thus, the Court finds there is some potential prejudice to the defendant if the amendment is allowed. Moreover, as a continuance would not prevent the time and cost of conducting additional discovery or drafting an additional motion to dismiss, it would not cure any prejudice to the defendant. Accordingly, these factors also weigh against granting the plaintiff's motion for leave to amend.

Therefore, looking at the factors holistically and being mindful of its duty to focus on the party's diligence in seeking leave to amend, the Court finds that the plaintiff has not shown good cause to modify the scheduling order's deadline to amend pleadings. At least some of the proposed amendments are important because they might "directly affect[] [the plaintiff's] prospects of ultimate recovery." *Richards Grp., Inc. v. Brock*, No. 3:06-CV-0799-D, 2008 WL 1722250, at *2 (N.D. Tex. Apr. 14, 2008). But allowing such amendments after the parties have been litigating these issues since December 2021 could prejudice the defendant with no opportunity to cure. And—most egregiously—the plaintiff did not

– 35 –

bother to file a reply to explain his failure to meet the deadline to seek leave to amend and ultimately did not show that "the deadlines c[ould not] reasonably be met despite the diligence of the party needing the extension." *Sw. Bell Tel. Co.*, 346 F.3d at 546 (quoting *S&W Enters., L.L.C.*, 315 F.3d at 535). Thus, the Court denies the plaintiff's motion for leave to amend.

### 4.   Conclusion

In sum, the Court grants in part and denies in part the defendant's motion to dismiss the plaintiff's first amended complaint (Dkt. No. 27). Any wrongful death claim based on the allegedly negligent conduct of Officer Spurgin and any resulting liability the defendant might incur as Officer Spurgin's employer under that claim are dismissed. All other wrongful death claims and survival claims survive dismissal. Additionally, because the plaintiff has not shown good cause to modify the scheduling order and grant the plaintiff leave to amend his complaint for the second time, the Court denies the plaintiff's motion for leave to file his second amended complaint (Dkt. No. 38).

So ordered on March 20, 2024.

JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE